UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

ALBA TLALMANALCO CAMPOS,

                          Plaintiff,

            - against -

LVNV FUNDING, LLC,

                          Defendant.

**MEMORANDUM DECISION AND ORDER**

25-cv-5584 (BMC)

**COGAN**, District Judge.

Plaintiff brought this action under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq.*, against various furnishers and credit reporting agencies ("CRAs") for failing to remove the fraudulent lines of credit from her credit report.  All but one defendant, LVNV Funding, LLC ("LVNV"), has settled.[1]  LVNV has moved for summary judgment on the remaining claims.  For the reasons below, the motion is granted.

## BACKGROUND

Over six years ago, nonparty Credit One Bank opened a credit card account in plaintiff's name, bearing an Elmont, NY, address at which plaintiff never lived.  The account racked up $733 in expenses and late fees that went unpaid.  Credit One Bank charged off the balance, sold the debt, and after a series of transactions, LVNV became the owner of that debt.

LVNV is in the business of buying and pursuing charged-off receivables, such the Credit One Bank credit card account debt.  LVNV has no employees, but it engages Resurgent Capital

---

[1] The Court *sua sponte* amends the caption to accurately reflect the remaining parties.  See Wilson v. Hauck, 141 F. Supp. 3d 226 n.1 (W.D.N.Y. 2015) ("The Court *sua sponte* amends the caption of this case to reflect the dismissal of [a defendant]"); see also United States v. Edwards, 241 F.R.D. 146, 148 (E.D.N.Y. 2007) (recognizing that "the United States Court of Appeals for the Second Circuit often makes similar corrections *sua sponte*, and without citation to any specific Rule or other authority" (collecting cases)).

Services, L.P. ("RCS"), to manage its assets, including providing record-custodian and account maintenance services.

Last year, plaintiff discovered several discrepancies in her credit report and sent each of the three national CRAs a dispute package. The dispute package included, *inter alia*, a letter with her description of the fraud and a credit-monitoring report created by nonparty IdentityIQ.[2] In sum and substance, she theorized that a tax preparer whom she had previously hired had taken her personal information and stolen her identity.

One of the CRAs prepared an Automated Consumer Dispute Verification ("ACDV") report and compiled all of the documents in plaintiff's dispute package to send to LVNV. However, LVNV's address, as listed on on plaintiff's credit report, populates as in the care of RCS with RCS's address, so the ACDV was sent directly to RCS.

RCS investigated by comparing plaintiff's social security number, date of birth, and address as stated on the ACDV with its own records, and everything matched. So, about a week later, RCS returned the ACDV to Experian with "Response Code '23: Disputed information accurate.'" An RCS representative testified that "the information [RCS] had available on the account matched the information that [plaintiff] provided [so] there was no question about the accuracy of the information."

The same day it returned the ACDV to the CRAs, RCS sent plaintiff two letters. The first letter acknowledged receipt of her dispute and informed plaintiff that, although "LVNV Funding LLC will not sue you for [the debt], LVNV . . . may report or continue to report it to the

---

[2] Plaintiff also included an FTC Identity Theft Report, which contained a temporal discrepancy as to the LVNV account. The report reflects that the fraud began in June 2025, but that plaintiff discovered it in November 2011, which obviously makes no sense. Plaintiff explained that this was a typo and that the 2011 date automatically populated, and that she did not catch the error because she does not speak English. LVNV unsuccessfully moved to dismiss this case primarily based on that typo, but it is of no consequence on summary judgment.

credit reporting agencies as unpaid." The second letter advised her of her right to request substantiation of the debt under New York law.

Two days later, RCS sent plaintiff a third letter, informing her that, after a "review of the claim and account [was] complete[d]," it was "unable to validate [her] claim." This letter also informed plaintiff that if she "wish[ed] for [RCS] to further investigate," she could provide additional documentation, and RCS provided a blank "Identity Theft Affidavit" for her to fill out. Plaintiff did not respond to any of the letters.

Having not received any response from plaintiff, RCS took no further action. And, having already received RCS's ACDV response indicating the debt was accurate, Experian continued reporting the debt as valid and open. Plaintiff then filed claims against LVNV arising under 15 U.S.C. § 1681s-2(b), which governs a furnisher's obligation to "conduct an investigation with respect to the disputed information."

## DISCUSSION

### I.    Summary Judgment Standard

Summary judgment is warranted where the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must view all facts in the light most favorable to the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (citing Adickes v. S. H. Kress & Co., 398 U.S. 144, 158-59 (1970)). There is no genuine issue of material fact "where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Lovejoy-Wilson v. NOCO Motor Fuel, Inc., 263 F.3d 208, 212 (2d Cir. 2001) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

A party may not defeat a motion for summary judgment solely through "unsupported assertions" or conjecture. Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d

3

Cir. 1995).  Rather, "'[t]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial.'"  Caldarola v. Calabrese, 298 F.3d 156, 160 (2d Cir. 2002) (quoting Matsushita, 475 U.S. at 586-87); see also Scott v. Coughlin, 344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525-26 (2d Cir. 1994).  Indeed, the non-moving party must offer "concrete evidence from which a reasonable juror could return a verdict in [its] favor."  Anderson, 477 U.S. at 256.

## II.    Analysis

Before getting to LVNV's FCRA-specific arguments, the Court must address the 600 pound elephant in the courtroom.  Plaintiff's entire theory is that a tax preparer stole her personal data and used it to open the fraudulent account, but discovery revealed that plaintiff did not work with this tax preparer until years after the fraudulent account was opened.   Defendant requested that plaintiff produce tax returns for all years that she employed this tax preparer.  If indeed this tax-preparing identity thief opened the account, plaintiff should have produced at least one tax return filed on or before 2020 (i.e., the year the account was opened).  But she did not.  The earliest tax return involving the alleged scammer is from 2023, and it simply defies logic that a fraud occurring in 2020 stemmed from information given to a tax preparer several years later.  Plaintiff offers no explanation or even attempts to reconcile this discrepancy.  For that reason alone, no reasonable jury could find in plaintiff's favor.

Beyond that, LVNV moves for summary judgment on two grounds: first, it is not a furnisher and thus not subject to suit under § 1681s-2(b); and second, even if it is a furnisher, its investigation was reasonable, but even if the investigation wasn't reasonable, no reasonable investigation would have yielded a different result.

4

### A.    Furnisher Status

An FCRA furnisher is "an entity that furnishes information relating to consumers to one or more consumer reporting agencies for inclusion in a consumer report."  12 C.F.R. § 1022.41(c).  Most of the time, the owner of a debt furnishes the information to the credit reporting agencies.  See Suluki v. Credit One Bank, N.A., 138 F.4th 709, 719 (2d Cir. 2025) ("Furnishers include banks, card issuers, and other financial institutions that transmit information relating to debts owed by consumers to CRAs for reporting.").

Here, the debt owner (LVNV) contracted with a business (RCS) to furnish to the CRAs information about the debts it owns.  As LVNV sees it, because it has no employees, it can't "do" anything, and thus this arrangement means that RCS is the furnisher.  Therefore, only RCS could be held liable under 15 U.S.C. § 1681s-2(b).[3]  That makes no sense and is in any event flatly contradicted by the record.

LVNV concedes that RCS acts pursuant to a power-of-attorney, meaning that, generally, whatever RCS does pursuant to that power is attributable to LVNV.  See Mar. Ventures Int'l, Inc. v. Caribbean Trading & Fid., Ltd., 689 F. Supp. 1340, 1353 (S.D.N.Y. 1988) ("A written power of attorney is a formal contract of agency and creates a principal-agent relationship.").  Moreover, there is a "Master Servicing Agreement" between the two entities, in which LVNV dictated the scope of RCS's services.  And, glaringly, LVNV's argument that it is not a furnisher

---

[3] LVNV consistently makes this argument in FCRA cases and usually loses.  See, e.g., Johns v. Nelnet, No. 22-cv-4791, 2026 WL 914621, at *21 (E.D. Pa. Mar. 31, 2026) (finding "LVNV can be found vicariously liable under the FCRA for actions taken by Resurgent acting as its agent" where "all actions taken with respect to LVNV's accounts, including credit reporting, are performed by Resurgent.").  The one instance in which LVNV prevailed is inapposite.  In Woods v. LVNV Funding, No. 19-cv-03451, 2021 WL 1758952, at *5 (S.D. Ind. May 4, 2021), like here, the debtor-plaintiff received a letter stating "that LVNV 'may' report the unpaid debt 'if' he fails to pay it."  But the letter in Woods was not sent by RCS; it was sent by another entity – Halsted Financial – that had no obvious relationship with LVNV.  Id.  Here, in contrast, RCS is not a disinterested third-party debt collector.  RCS acts specifically pursuant to the contracts with and directions from LVNV.

5

flies in the face of the letter it sent to plaintiff (through RCS), stating that "LVNV . . . may report or continue to report [plaintiff's debt] to the credit reporting agencies as unpaid."

LVNV is the owner of the debt and furnishes that information to the CRAs through RCS. It may be that RCS is also a furnisher, but that would have no effect on LVNV's status as a furnisher.[4]  Accordingly, there is no genuine dispute as to whether LVNV is a furnisher.

### III.    LVNV's Investigation

Having found LVNV to be a furnisher, the next question is whether there is any genuine dispute as to whether RCS's investigation into plaintiff's dispute was reasonable or, even if it wasn't reasonable, whether a reasonable investigation would have yielded a different result.

Although the Second Circuit has "not elaborated on what it means to conduct a reasonable investigation, [] the question is not a complicated one."  Suluki, 138 F.4th at 720. The "inquiry is fact-dependent and turns in part on 'what the furnisher learned about the nature of the dispute from the description in the CRA's notice of dispute.'"  Id. (quotations omitted and alterations adopted).  Nonetheless, "[s]ummary judgment in favor of the furnisher [] is appropriate where no reasonable factfinder could conclude that the investigation was unreasonable."  Id.

During the course of this litigation, the credit reporting agencies removed the LVNV debt from plaintiff's credit report.  Plaintiff sees this as "evidence that a reasonable investigation

---

[4] Sometimes, CRAs will contract with businesses to furnish information about debts owned by others.  See, e.g., Silver v. Top Line Reporting Inc., No. 25-cv-4375, 2026 WL 1802906, at *1 (E.D.N.Y. June 23, 2026) ("Top Line has a 'Data Furnishers Reporting Agreement' with Trans Union" under which it "collects rental payment data from [landlords] and/or otherwise manages the rental payment transaction on behalf of [landlords]."); Shimon v. Equifax Info. Servs. LLC, No. 18-cv-2959, 2018 WL 4906245, at *1 (E.D.N.Y. Oct. 9, 2018), aff'd, 994 F.3d 88 (2d Cir. 2021) ( "LexisNexis Risk Solutions [] collects and furnishes credit information from court records . . . through a contract with Equifax").  Doing so does not convert the credit reporting agency into a furnisher, however, because the two are mutually exclusive.  See 12 C.F.R. § 1022.41(c)(2) ("An entity is not a furnisher when it [is] acting as a 'consumer reporting agency'").  But that situation is inapposite here, where a debt owner (not a CRA) contracts with an entity to perform it's furnishing duties.

could have produced a result different from the one RCS reached." That's misleading. Although her overarching story has remained consistent, as discussed below, there are material differences between plaintiff's description of the fraud in the dispute packages sent to the CRAs, and her description of the fraud throughout this litigation. What matters here is the former, because "what the furnisher learned . . . from the description in the CRA's notice of dispute," id., is what the Court must gauge the reasonableness of any investigation.

Plaintiff contends that a reasonable investigation would have revealed the discrepancy between the Queens, NY, address listed on her license (and dispute letter caption), and the Elmont, NY, address listed on the billing statements for the fraudulent account. And, says plaintiff, a public records search for the Elmont, NY, address would have revealed it was owned by someone named "Eduardo." As the final nail in the coffin, plaintiff points out that the name "Eduardo" shows up as a recipient of numerous cash-transfer transactions on the billing statements for the fraudulent account. In plaintiff's view, all of this points toward fraud (ostensibly committed by Eduardo) because she didn't live at that address and that isn't her name.

Plaintiff's theory rests on two factual assumptions. First, it assumes that if plaintiff ever lived at the Elmont NY, address, her name would have populated up on the public records search. Second, it assumes that LVNV did not notice the difference in addresses. The first assumption is clearly wrong because not all residents of a property (*e.g.*, renters) appear on a public records search, so any discrepancy there could not have alerted LVNV to a problem. In other words, the mere fact that plaintiff's name would not show up on a public records search is not a reason to question whether she ever lived there.

The second assumption might be correct, but in the end it doesn't matter. Even if LVNV did not see that the Queens, NY, address on her license was different from the Elmont, NY, address on the fraudulent account statements, nothing would have changed if it did. This is because when plaintiff sent in her dispute, the credit-monitoring report from IdentityIQ listed the Elmont, NY, address as her "previous address," and she never stated that, in fact, she was never associated with that address. This means that even if LVNV didn't see the discrepancy, it had no reason to question the veracity of plaintiff's "previous address" in Elmont, NY.[5] In those circumstances, any reasonable investigator would have likewise affirmed the accuracy of the debt. Put differently, even assuming LVNV's investigation was unreasonable, no reasonable investigation would have yielded a different result.

Accordingly, even if there were a genuine dispute as to whether LVNV's investigation was reasonable, there is no genuine dispute that no reasonable investigation – based on the information provided by plaintiff at the time – would have yielded a different result.

---

[5] The differences between plaintiff's description of the fraud in her dispute letter to the CRAs and her description in her interrogatory responses illustrate this point. In plaintiff's interrogatory responses, she emphasized that she "recognized that [the Elmont, NY address] is the address of [name omitted by the Court], the individual who had previously prepared [her] taxes [and stolen her personal information]." But in her dispute letter, she did not name the individual, nor did she indicate in any way that the Elmont, NY address relevant to the fraud. Plaintiff further blames LVNV that it did not "request clarification [] regarding this address discrepancy before responding to the ACDV." In her view, LVNV was wrong to return the ACDV as accurate before sending plaintiff the form asking for, *inter alia*, her address "Now" and her address "At the Time of the Fraud." That is a red herring because plaintiff never responded to LVNV's request for more information. Thus, even if LVNV gave plaintiff months to respond before it returned the ACDV as accurate without her input, nothing would have changed.

8

**CONCLUSION**

LVNV's motion for summary judgment is granted.

**SO ORDERED.**

Dated:   Brooklyn, New York
         July 21, 2026

*Brian M. Cogan*

U.S.D.J.

9